UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAURA RESNANSKY, et al.,

        Plaintiffs,

      v.

THE UNITED STATES OF AMERICA,

        Defendant.

Case No.  13-cv-05133-DMR

**ORDER RE: PLAINTIFFS' MOTION TO INCREASE AD DAMNUM CLAIMS AMOUNTS**

Re: Dkt. No. 30

Before the court is Plaintiffs' motion for an order permitting them to seek damages exceeding the amounts alleged in their administrative claims pursuant to 28 U.S.C. § 2675(b). [Docket No. 30.]  The court held a hearing on the motion on April 9, 2015.  Having considered the parties' submissions and oral argument, the motion is **granted in part and denied in part.**

## I.      BACKGROUND

### A.    The Incident

The following allegations are taken from the Complaint.  Plaintiffs Laura Resnansky and Kris Jacob are married to each other.  On February 12, 2013, Resnansky was walking in a crosswalk near the Presidio National Park in San Francisco when she was struck by a vehicle owned by Defendant[1] being driven by Defendant's employee, Karl Twiford.

Plaintiffs allege that the collision "legally and proximately caused" the following injuries to Resnansky's left wrist and right ankle:

---

[1]  The named Defendant is the United States of America.  Plaintiffs allege that the entity that owned the vehicle that struck Resnansky was The Presidio Trust, which "is and at all relevant times was a federal executive agency or department as described in detail at Title 14 United States Code §1, *et seq*."  Compl. at 2.  The court refers to The Presidio Trust and the United States of America as "Defendant."

> [A] comminuted intra-articular of the distal radius as well as a minimally displaced ulnar styloid fracture in her left wrist, as well as a displaced fracture of the distal fibula below the tibial plafond in her right lower extremity.  She also suffered other injuries to her body.

Complaint. at ¶ 1.

**B.      The Federal Tort Claims Act ("FTCA") Claims**

On May 1, 2013, Plaintiffs presented written claims to The Presidio Trust as required by the FTCA.  Resnansky filed a claim for $1 million, and Jacob filed a claim for $100,000.  By November 4, 2013, the government had taken no action on either of the claims, therefore deeming them rejected by operation of law.  *See* 28 U.S.C. § 2675(a).

**C.      The Lawsuit**

Plaintiffs filed this lawsuit on November 4, 2013.  With respect to damages, the Complaint alleges that "[b]ased on current information, plaintiff believes her past medical bills total approximately $80,000, with approximately $60,000 paid."  Complaint at ¶ 5.  Plaintiffs also sought special damages in the amount of $186,939.49 because Resnansky "has been unable at times to follow her regular work/occupational duties in her job as well as domestic chores," but noted that "[t]his is an estimate and the presently unascertained sum is not yet finally determined." *Id.* at ¶ 6.  Furthermore, Plaintiffs alleged that Resnansky sustained "general damages for pain, suffering, disability, inconvenience, embarrassment, and all other compensable elements of non-economic harm in the amount of $633,060.51."  *Id.* at ¶ 7.

In the claim for loss of consortium, the Complaint states that Jacob "suffered the loss of support, services, love, companionship, affection, society, and other elements of consortium, all to his general damage in an amount of $100,000."  *Id.* at ¶ 10.

**D.  Resnansky's Medical Treatment**

**1.      Initial Treatment**

After the incident, Resnansky was taken to San Francisco General Hospital, where she was diagnosed with a fracture in the radius of her left wrist and a fracture in her right ankle. Resnansky's right leg was placed in a walking boot and her left wrist was splinted.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dr. Jeffrey Yao treated Resnansky's wrist.  He determined that she had a comminuted, or "smashed," wrist fracture.   On February 15, 2013, Dr. Yao performed surgery, which included placing a plate and screws in the wrist.  After surgery, Resnansky commenced physical therapy, which she continued through approximately June 2013.

For her ankle, Resnansky was referred to Dr. Kirstina Olson.  Dr. Olson did not perform or recommend surgery at that time.  Instead, Dr. Olson kept Resnansky's right ankle in the boot for six weeks, and prescribed physical therapy.  Resnansky participated in physical therapy for her ankle from approximately April until the end of August 2013.

### 2.    December 2013: Second Wrist Surgery

As noted above, Plaintiffs filed their FTCA claims on May 1, 2013.  After May 1, 2013, Resnansky received additional treatment for her wrist and ankle.

On November 18, 2013, Resnansky saw Dr. Yao, complaining of pain on the dorsal aspect of her wrist.  Dr. Yao recommended a second surgery to see if Resnansky's tendons were being irritated by the screws that Dr. Yao had placed into her wrist during the first surgery, and to remove the hardware since it was no longer necessary because the bone had healed.  Dr. Yao also recommended an arthroscopy procedure since Resnansky was experiencing pain within the joint.

On December 17, 2013, Dr. Yao performed a second surgery on Resnansky's wrist.  During the second surgery, Dr. Yao removed the plate and screws that he had previously installed.  He also performed an arthroscopy and discovered a stretched scapholunate ligament, which he treated with heat.  During the surgery, Dr. Yao noted "a nerve that we often find that may be irritated and may cause pain in the exact area where [Resnansky] was having pain."  Yao Dep. at 44:14-19.  Dr. Yao removed the nerve as a pain-relieving procedure.

### 3.    September 2014:  Ankle Surgery

Resnansky finished a course of physical therapy for her ankle in August 2013.  She contends that her right ankle began bothering her in the spring and summer of 2014, as she attempted to increase the duration of her exercise.  On June 9, 2014, Resnansky went back to consult with Dr. Olson.  Dr. Olson ordered an MRI, which revealed that Resnansky had some inflammation or edema, some fluid around her tendons, bone marrow edema of the talus, and an

United States District Court
Northern District of California

1   osteochondral defect (i.e., a cartilage injury) with thinning of the subchondral bone underneath.

2   Dr. Olson then recommended ankle surgery.  On September 25, 2014, Resnansky underwent

3   surgery on her right ankle.

4        Resnansky and Jacob now claim that newly discovered evidence and/or intervening facts

5   justify an increase beyond their original administrative FTCA claims.  Resnansky seeks to

6   increase her claim from $1,000,000 to $4,000,000.  Jacobs seeks an increase from $100,000 to

7   $500,000.  Neither Plaintiff provides a breakdown to explain the type or quantity of damages, or

8   how the increased amounts are tethered to the newly discovered or intervening evidence.

9                          **II.      LEGAL STANDARDS**

10        The FTCA provides plaintiffs an exclusive remedy against the United States for injuries

11  arising out of tortious acts committed by federal government employees within the scope of their

12  employment.  28 U.S.C. § 2671 *et seq*.  As a prerequisite to filing suit under the FTCA, a plaintiff

13  must exhaust his or her administrative remedies.  28 U.S.C. § 2675(a).  Particularly, Section

14  2675(a) requires a plaintiff to first present an administrative claim to the appropriate federal

15  agency and then receive a final denial of the claim from the agency or allow six months to pass

16  without a final disposition.  *Id.*  Thereafter, if the plaintiff files an action in the district court for

17  damages, the FTCA prohibits the plaintiff from seeking damages "in excess of the amount of the

18  claim presented to the federal agency."  *See* 28 U.S.C. § 2675(b).

19        However, Section 2675(b) carves out two exceptions to this cap on recoverable damages:

20           Action under this section shall not be instituted for any sum in
              excess of the amount of the claim presented to the federal agency,
21           except where the increased amount is based *upon newly discovered*
              *evidence not reasonably discoverable at the time of presenting the*
22           *claim* to the federal agency, *or upon allegation and proof of*
              *intervening facts*, relating to the amount of the claim.
23

24  28 U.S.C. § 2675(b) (emphasis added.)

25        "The two exceptions are distinct: 'newly discovered evidence' denotes evidence that

26  existed when the administrative claim was filed, but was 'not discoverable' at that time;

27  'intervening facts,' on the other hand, concern information or events arising after the filing of the

28  claim."  *Von Bargen v. United States*, No. C 06-04744 MEJ, 2009 WL 1765767, at *2 (N.D. Cal.

                                    4

United States District Court
Northern District of California

1    June 22, 2009) (quoting *Lowry v. United States*, 958 F. Supp. 704, 710 (D. Mass. 1997)).  "While

2    a plaintiff may seek a larger amount if he meets either of these tests, the burden of proof under

3    both falls on the plaintiff."  *Salcedo–Albanez v. United States*, 149 F.Supp.2d 1240, 1243 (C.D.

4    Cal. 2001) (citing *Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990)); *see also Zurba v.*

5    *United States*, 318 F.3d 736, 739 (7th Cir. 2003).

6          The Ninth Circuit has yet to issue significant guidance regarding Section 2675(b).  In

7    *Richardson v. United States*, 841 F.2d 993, 999 (9th Cir. 1988), the court held that a plaintiff

8    cannot seek damages beyond the amount set forth in the administrative claim if the injuries were

9    "reasonably foreseeable" at the time the claim was filed.  The court further noted that the newly

10   discovered evidence or intervening facts must have come to light after the date of the claim.

11         Other circuit courts have elaborated upon the widely-recognized "reasonably foreseeable"

12   standard.  For example, the Eleventh Circuit held that the FTCA does not charge plaintiffs with

13   "knowing what the doctors could not tell [them]."  *Fraysier v. United States*, 766 F.2d 478, 481

14   (11th Cir. 1985).  The Fifth Circuit, building on *Fraysier*, acknowledged that claimants should not

15   be responsible for information beyond that provided by their doctors, but went on to note that "the

16   information [offered to support an increased claim] must not have been discoverable through the

17   exercise of reasonable diligence."  *Low v. United States*, 795 F.2d 466, 470 (5th Cir. 1986).[2]  The

18   _____

19          [2]     Nothing in *Low* suggests that "reasonable diligence" requires a plaintiff to engage
     in affirmative efforts to determine what is "reasonably foreseeable" before filing an administrative

20   claim.  In fact, an earlier sentence in *Low* states that alleged newly discovered evidence or
     intervening facts simply must not have been "reasonabl[y] capable of detection" when the claim

21   was filed.  795 F.2d at 470.  *See also Reilly v. United States*, 863 F.2d 149, 173 (1st Cir. 1988)
     (charging plaintiffs with "matters known or easily deducible" when claim is filed).  This court is

22   persuaded that the law does not require claimants to take steps to obtain medical information
     beyond what is recommended by the treating providers in order to ascertain what is reasonably

23   foreseeable before filing a claim.  However, a claimant should not be permitted to ignore their own
     symptoms, or facts or possible outcomes that flow from a straightforward connecting of the dots in

24   existing treatment records.
            The court found only one decision which suggests an affirmative requirement.  *See Van*

25   *Bargen*, 2009 WL 1765767 at *7 (denying increase where plaintiff argued that post-claim MRI
     indicated spinal disc protrusion, and holding that "it was not the disc protrusion that was

26   undiscoverable prior to [filing of the claim]— *it was the fact that Plaintiff had not undergone an
     MRI* that left the condition undiagnosed.") (emphasis in original).  This court respectfully

27   disagrees with *Van Bargen* to the extent it imposes a requirement that a claimant must obtain
     additional medical testing beyond that which is prescribed or recommended by the claimant's

28   providers.

Eighth Circuit recognized that even a known injury can "worsen in ways not reasonably discoverable by the claimant and his or her treating physician." *Michels v. United States*, 31 F.3d 686, 688 (8th Cir. 1994).  However, according to the Fourth Circuit, where doctors later confirm what a plaintiff knew prior to filing the claim, the later diagnoses do not support an increase in damages because they are merely "cumulative and confirmatory," and therefore cannot be considered "intervening facts."  *Kielwien v. United States*, 540 F.2d 676, 680 (4th Cir. 1976).

Some courts have articulated a standard that requires plaintiffs to contemplate the "worst case scenario" presented by the medical evidence before filing a claim.  *See, e.g., Michels*, 31 F.3d at 688 ("[W]hen existing medical evidence and advice put the claimant 'on fair notice to guard against the worst-case scenario' in preparing the administrative claim," an attempt to increase the amount of the claim during litigation should be rejected) (*citing Reilly*, 863 F.2d at 172).  However, cases have also recognized that just because an outcome may be *conceivable* does not render it reasonably foreseeable.  *See, e.g., id.* (allowing increased claim; plaintiff's post-claim surgery was not reasonably foreseeable even though doctor noted possibility but low likelihood of future surgery); *Smith v. United States*, No. C 10-00212 WHA, 2011 WL 4551471, at *1 (N.D. Cal. Oct. 3, 2011) (foot surgeries performed or anticipated after administrative claims were not reasonably foreseeable where, prior to administrative claim, doctor stated that "it is conceivable that [plaintiff] might require some surgical intervention in the future but, if the fracture is not severe, this would be rather unlikely.").  *But see Van Bargen*, 2009 WL 1765767 (applying "worst case scenario" standard and rejecting argument for increase in FTCA claim amount).

Taken literally, a "worst case scenario" standard would incentivize plaintiffs to err on the side of filing higher administrative claims, in order to guard against theoretical catastrophic outcomes.  This is contrary to the policies underlying the FTCA claim process, which encourage realistic valuation of a claim against the government in aid of early settlement.  *Accord Milano v. United States*, 92 F. Supp. 2d 769, 776 (N.D. Ill. 2000) ("[Defendant's] position would require

United States District Court
Northern District of California

that Plaintiff inflate his claim based on events that are, although arguably foreseeable, highly unlikely.  Defendant aptly notes that one of the purposes of the FTCA is allowing the government to know at all relevant times its maximum possible exposure to liability and make a realistic assessment of the settlement value of the case.  Requiring that Plaintiff inflate his claim to account for the unlikely worst possible scenario places the government in no better position to realistically assess the value of the Plaintiff's claim.").

On the other hand, allowing a Plaintiff to seek damages beyond the amount of the administrative claim without a searching standard is also counterproductive to FTCA policies.  Indeed, in the present case, Defendant argues that defending against a $1 million claim is by its very nature different from facing a $4 million claim.  A significantly higher claim can be a game-changer, for the government may well have decided to allocate a higher level of resources to defend against the claim had it been originally filed with the increased amount.  *Accord Allgeier v. United States*, 909 F. 2d 869, 878 (6th Cir. 1990); *Salcedo-Albanez*, 149 F. Supp. 2d at 1245 (increase in claim value may have affected government's prior analysis and handling of Plaintiff's claim).

The question of whether an increase is justified by newly discovered evidence or intervening facts is inherently fact-specific.  A review of the cases drives this point home.  In some cases where a doctor explained a medical risk prior to the claim filing, the plaintiff was subsequently allowed to increase the claim value.  This is because the risk, although known at the time the claim was filed, was not expected to develop into a reality.  For example, in *Michels*, 31 F.3d at 687, after the plaintiff's motorcycle was struck by a government vehicle, the plaintiff required surgery and physical therapy on his lower limbs.  At the time the plaintiff filed his administrative claim, his doctor opined that the development of arthritis and hip necrosis as well as the need for further surgery could ensue, but were not presently indicated by medical signs.  *Id.* However, by trial, the plaintiff required further surgery on his hip and knee.  The court found that the plaintiff's hip necrosis, arthritis and need for future hip and knee surgery were "not reasonably discoverable" even though the risks that led to those outcomes were known at the time of the plaintiff's claim, because a "known injury can worsen in ways not reasonably discoverable by the

1    claimant and his or her treating physician." *Id.* at 688.

2         Similarly, in *Allgeier*, 909 F.2d at 869, the plaintiff was involved in a car accident resulting

3    in injuries to both knees.  The plaintiff's doctor advised that both knees needed arthroscopic

4    surgery, but the plaintiff elected to have surgery only on her right knee.  The plaintiff then filed

5    her administrative claim.  At that time, her "condition had improved and . . . the additional surgery

6    was no longer contemplated." *Id.* at 878.  The plaintiff told her doctor that both of her knees were

7    feeling much better.  The doctor had discharged her from his care, which "may have . . . led [the

8    plaintiff] thereby to believe that her injuries were, to some extent, cured." *Id.* at 878-79.

9    However, some months after filing the claim, her condition began to deteriorate, leading to

10   surgery on the second knee.  The district court ultimately awarded the plaintiff $54,000 more than

11   the amount she had stated in her administrative claim.  The Sixth Circuit upheld the award, even

12   though plaintiff's doctor had originally advised surgery in *both* knees, but plaintiff opted for

13   surgery in only one.  The court held that "because of the relative improvement in [the plaintiff's]

14   condition immediately before the administrative claim was filed and the significant worsening of

15   her condition well over a year later, the need for the second operation and extensive additional

16   treatment were not reasonably foreseeable at the time the administrative claim was filed." *Id.* at

17   879.

18        Similarly, courts have allowed increases for subsequent surgery where medical providers

19   first take a conservative non-surgical approach that appears to be sufficient at the time the claim is

20   filed.  For example, in *Craig v. United States*, No. 00 C 958, 2002 WL 31115604 (N.D. Ill. Sept.

21   23, 2002), the plaintiff filed her administrative claim only seventeen days after a car accident with

22   a government vehicle.  At that time, "the extent of the plaintiff's injuries was virtually unknown . .

23   . . [and] there [was] no evidence in the record that either she or her doctors reasonably expected

24   that she would ultimately have to have invasive surgery to alleviate her back pain" after she had

25   filed her claim. *Id.* at *3.  "Instead, what is clear from the record is that, at the time she submitted

26   her claim . . . she had been informed by her doctors that a conservative course of treatment with an

27   emphasis on physical therapy should have been sufficient to treat her pain." *Id.* at *4.  The court

28   permitted an increase over the amount of the administrative claim, finding that because "surgery

United States District Court
Northern District of California

8

was not considered as a realistic possibility" until nearly two years after the plaintiff filed her administrative claim, "the progressive deterioration of the condition of her back as potentially an intervening fact not foreseeable at the time she filed her administrative claim." *Id.* at *4.

However, in other cases, claim increases for subsequent surgery have been denied because the surgery was reasonably foreseeable at the time the claim for filed. For example, in *Myers v. United States*, 805 F.Supp. 90 (D.N.H. 1992), the plaintiff was involved in an accident with a postal service vehicle that caused injury requiring knee surgery. Subsequent to the filing of the claim, the plaintiff's doctor recommended further reconstructive knee surgery. The district court denied plaintiff's motion to recover additional damages, ruling that "[i]n the face of well-documented ACL damage, one surgery, and subsequent ongoing knee problems . . . the court is unable to say that [the plaintiff's] need for additional surgery was unforeseeable." *Id.* at 93.

Similarly, in *Salcedo-Albanez*, 149 F. Supp. 2d at 1240, the plaintiff had been struck by a border control car, causing dislocation of a lens implant in her eye, as well as elevated pressure in her other eye. After performing eye surgery, her doctor continued to monitor her medication, which he warned would be essential to reducing the risk of permanent damage to the optical nerve. The doctor later determined that medication was not adequately controlling the pressure in her eye, and that surgery was required. Plaintiff did not opt for surgery, and later filed an FTCA claim for $75,000. Several months later, a second doctor advised her that she had sustained permanent damage to her vision and recommended surgery, which she finally underwent. The court denied her motion to amend her complaint to seek greater damages, finding that the basis for her increased claim was reasonably foreseeable. In so doing, the court noted that the record "plainly establishe[d] that Plaintiff was on notice that her optical nerve was at risk of permanent damage in the absence of adequate medical treatment, . . . [and] that she needed surgery to alleviate the intraocular pressure in her right eye two months before she filed her claim." *Id.* at 1244.

Given the fact-driven nature of the "reasonably foreseeable" analysis, it is difficult to articulate a clear statement of how to apply it in any given case. The court distills the following tenets from prior cases, and is persuaded that their application will serve the policies underlying the FTCA. A plaintiff should not be charged with knowing what his or her medical providers do

9

not articulate, nor is a plaintiff required to obtain additional medical information through procedures not otherwise ordered or suggested.  In valuing an administrative claim, a plaintiff need not account for "conceivable but unlikely" risks.  However, when filing a claim, a plaintiff is on fair notice of all present information, including his or her own symptoms as well as the providers' advice, prognoses and recommendations.   In evaluating reasonable foreseeability, a court should examine the arc of the plaintiff's medical status, including ongoing symptoms and periods of recovery or deterioration.

### III.    DISCUSSION

#### A.    Reasonable Foreseeability of Resnansky's Newly Claimed Injuries

With these principles in mind, the court turns to Plaintiffs' contentions.  Specifically, Plaintiffs assert that "Mrs. Resnansky and her own treating physicians did not anticipate the ligament damage [in her wrist], the osteochondral lesion [in her ankle], or the need for either the December 2013 wrist surgery or the September 2014 ankle surgery."  *Id.*  The court considers each of these below.

##### 1.    Ankle Surgery

In support of the contention that Resnansky's September 2013 ankle surgery was not reasonably foreseeable, Plaintiffs rely on records and statements from Dr. Olson.  On April 8, 2013, after several weeks of using the ankle boot, Resnansky saw Dr. Olson for a follow-up visit.  Dr. Olson's record from this date notes "good evidence of healing," and that she is releasing Resnansky to be seen on an as-needed basis.  Dr. Olson continued to see Resnansky until August 13, 2013.  Resnansky went back to see Dr. Olson approximately ten months later, complaining that she could not return to her normal activities, including physical exercise, due to pain and instability in her ankle.  At her deposition, Dr. Olson was asked about the "significance" of Resnansky's subjective complaints on the June 9, 2014 return visit, and replied, "Being that she's otherwise young and healthy and active and she had—apparently had more than a year . . . I would anticipate that at this point she would be able to get back to her activity."

In response, Defendant points to evidence that Resnansky's ankle pain was ongoing since the time of her injuries.  Resnansky testified that her ankle was "weak and sore" once the boot was

removed in April 2013.   She also testified that she had been traveling internationally for work about once or twice a month since June 2013, and that her ankle and wrist both experienced swelling and pain during air travel.  Resnansky Dep. at 83:9-84:24.  Dr. Olson examined Resnansky's ankle in April 2013 and found that it "appeared to be improving at that point but still had pain on the outside of her ankle," effusion (swelling) of the ankle joint, tenderness over her lateral ligaments, and that Resnansky's gait "was still antalgic or painful."  Olson Dep. at 19:3-19.

In this case, Dr. Olson released Resnansky from her care in August 2013 based upon the belief that Resnansky's ankle showed good evidence of healing.  This suggests that Dr. Olson believed, like the treating doctor in *Craig*, that "a conservative course of treatment with an emphasis on physical therapy should have been sufficient to treat her pain."  Nothing in the record suggests that Dr. Olson recommended surgery, or forecast surgery as a likely future outcome.  Moreover, there is no evidence to support non-diminishing pain or deterioration of her ankle condition near the May 1, 2013 claim filing date.  In fact, Resnansky had been discharged from regular care as well as physical therapy by August 2013, and did not return to see Dr. Olson with further complaints until nearly a year later in June 2014.

On balance, the court finds that Plaintiffs  have met their burden of demonstrating that Resnansky's September 2014 ankle surgery was not reasonably foreseeable at the time she filed her FTCA claim in May 2013, and grants Plaintiffs' motion insofar as it is premised on Resnansky's ankle surgery.

### 2.        Osteochondral Lesion in Ankle

Plaintiffs also contend that the osteochondral lesion in her ankle, which was first diagnosed after her June 2014 MRI, was not reasonably foreseeable at the time that Resnansky filed her FTCA claim.

For this contention, Plaintiffs note that Resnansky's initial post-incident records from San Francisco General Hospital do not mention the osteochondral lesion.  Plaintiffs also note that Defendant's orthopedic expert, Dr. James Glick, agreed that the osteochondral lesion was not diagnosed until 2014.

At least one aspect of Dr. Glick's report suggests that the lesion may have been

United States District Court
Northern District of California

foreseeable.  Dr. Glick's report reviews the June 2014 MRI of Resnansky's ankle as well as Dr.
Olson's report after the MRI.  Dr. Glick notes that the MRI shows "an osteochondral defect or a
cartilage injury with thinning of the subchondral bone underneath," and that "Dr. Olson noted that
. . . very often when people have a twisting injury that is consistent with an avulsion type of
fracture or a distal fibula fracture, it tears or tethers the lateral ligaments through an inversion type
of strain."  Tseng Surreply Decl. [Docket No. 44-1] at ¶ 2, Ex. R (Glick Report) at 12.  Thus, Dr.
Glick's report suggests that an osteochondral lesion  occurs "very often" when people suffer the
type of fracture sustained by Resnansky.

However, just because a type of injury is typical of or consistent with a medical scenario
does not mean that it was reasonably foreseeable.  As noted above, Dr. Olson released Resnansky
from her care, and her symptoms did not give her cause to return until ten months later.  It is
undisputed that the osteochondral lesion was not discovered until well after Resnansky filed her
claim.  The court finds that Plaintiffs have met their burden of establishing that the osteochondral
lesion was not reasonably foreseeable.

### 3. Second Wrist Surgery

Plaintiffs assert that Resnansky's second wrist surgery was not reasonably foreseeable.
For this contention, Plaintiffs raise evidence of Dr. Yao's generally positive assessment of
Resnansky's progress on April 25, 2013.  This was approximately two months after her first
surgery, when Resnansky returned to Dr. Yao for a post-operative follow-up visit.  Dr. Yao's
notes state that Resnansky reported that she was "doing quite well."  Saeltzer Decl. at ¶ 5, Ex. D
(records from Stanford Hospital) at 000154.  The record indicates that Resnansky still had
numbness in the tip of her thumb, but it was improving, and generally "the wound [was] healing
well."  *Id.*  An x-ray taken on the same day showed "excellent interval healing of the distal radius
fracture."  *Id.*  Dr. Yao states that he is "pleased with how this is doing" and further notes that
Resnansky "is improving relatively slowly in terms of therapy, therefore, I recommend that she
continue with aggressive hand therapy."  *Id.* at 000155.  Dr. Yao released Resnansky to "full duty
in terms of work" at that time.  *Id.*  At his deposition, when questioned about the April 25, 2013
visit, Dr. Yao explained that Resnansky was "overall doing quite well."  *See* Saeltzer Decl. at ¶ 6,

Ex. E (Yao Dep.) at 34:5-8[3]

In response, Defendant first notes that Resnansky's wrist pain was essentially ongoing between the time of the accident and the second wrist surgery. Resnansky went on medical leave for approximately five or six weeks from March to May 2013. Resnansky Dep. at 68:9-69:8. When she returned to work in May 2013, her wrist was still bothering her. *Id.* at 69:24-70:3 ("A: It was better, but it was still bothering me. So typing was hard."). Her wrist pain became progressively worse from May to November 2013, prompting her to seek Dr. Yao for additional treatment, including the second wrist surgery. *Id.* at 69:24-70:18 ("A: It was—probably got progressively worse from May until about November."). *Accord* Yao Dep. at 40-:19-25 ("A: Apparently she'd been doing very well but then two months prior to that encounter, which was in November [2013], so let's say September, she began to develop pain along the dorsal or top aspect of her wrist."). Defendant also notes that Dr. Yao told Resnansky at the time of her first wrist surgery that even with a good surgical outcome, there could be persistent pain, stiffness, loss of range of motion, and incomplete resolution of symptoms. Defendant also points to Dr. Yao's testimony that the surgically-placed screw may have irritated a tendon, thereby causing pain, and that this was a "normal risk" of the type of surgery he had performed. *Id.* at 42:10-13.

Here, Plaintiffs' evidence of the unforeseeability of the second wrist surgery hinges on Dr. Yao's optimistic assessment of the healing of Resnansky's wrist as of April 25, 2013. However, this ignores Resnansky's own symptomology. She testified that she was experiencing ongoing pain from the date of the accident and continuing to her return to work in May 2013. She further testified that her pain got "progressively worse" from May until November 2013, when she returned to see Dr. Yao. Resnansky must be charged with knowledge of her own symptoms as of the date of her May 2013 claim, notwithstanding her doctor's rosier view of her medical condition. Thus Plaintiffs' motion, insofar as it is premised on the second wrist surgery, is denied.

---

[3] In their motion, Plaintiffs state that Dr. Yao testified that as of July 1, 2013, Resnansky was "doing 'extremely well' with radiographic evidence of good healing of the fracture and that he placed no restrictions on her." Mot. at 3 n. 1 (citing Yao Dep. at 36:14-37:4). However, Plaintiffs did not include the cited portion of Dr. Yao's deposition in its submissions, so this testimony cannot be confirmed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.   Scapholunate Ligament Damage in Wrist

Finally, Plaintiffs contend that the damage to the scapholunate ligament in Resnansky's wrist was caused by the accident and was also unforeseeable.

The court need not address the issue of whether Resnansky sustained this injury as a result of the accident.   The relevant question is whether Plaintiffs can seek increased damages if they succeed in establishing causation at trial.

To show that the scapholunate injury was not reasonably foreseeable, Plaintiffs raise evidence from Defendant's expert, Dr. Glick, who was deposed on March 5, 2015 after Plaintiffs filed the present motion.[4]  Dr. Glick noted that the scapholunate injury was "probably something that was diagnosed actually during the December 2013 [second wrist surgery] procedure," and that "there was no evidence of this at the time of [the first] surgery."  Saeltzer Supp. Decl. [Docket No. 40] at ¶ 2, Ex. G (Glick Dep.) at 24:4-15.  Dr. Glick stated that immediately after Resnansky's injury, her doctors did not "look in the wrist" for damage to her scapholunate ligament, which was "usual" because they were focused on operating on her wrist fracture during the first surgery.  *Id.* at 24:18-25.  Dr. Glick stated that "[t]his is sort of a surprise, in a way, that she had injured this."  *Id.* at 24:23-25; *see also id.* at 25:8-19 ("Q: The failure to look and detect a ligament injury was not due to any malpractice, true?  A: Yes . . . . Q: It's a complicated injury and sometimes it takes a while to present and be diagnosed.  A: Well, yes.  I think if this was me, I'd be surprised to have found it."); 28:4-8 ("She was having pain following a good reduction of the fracture.  Okay?  So now they're looking for something else.  And they found later on that she had these ligament problems in the wrist.").

Here, the evidence from Defendant's own expert indicates that the scapholunate injury was

---

[4]  The court notes that Plaintiffs raised this evidence on reply, which is generally improper.  *See, e.g.*, *Daghlian v. DeVry Univ., Inc.*, 461 F. Supp. 2d 1121, 1144 (C.D. Cal. 2006) ("In general, it is improper for the moving party to 'shift gears' and introduce new facts or different legal arguments in the reply brief than those that were presented in the moving papers.  For this reason, the court has discretion to decline to consider new facts or arguments raised in a reply.") (formatting and citation omitted).  However, the district court may, in its discretion, "consider the [new] issue even if it was raised in a reply brief."  *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001) (quotation omitted).  If the court elects to consider new material in a reply brief, it must afford the opposing party an opportunity to respond.  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  Here, the court permitted Defendant to file a Surreply to respond to the new evidence in Plaintiffs' Reply.  *See* Docket No. 44.

a "surprise."  Defendant essentially concedes that Dr. Glick's testimony supports a finding that the scapholunate ligament injury was not reasonably foreseeable.  Surreply [Docket No. 44] at 3. For this reason, the court finds that Plaintiffs have met their burden..

### B.    Prejudice

Defendant contends that Plaintiffs' motion should be denied under Federal Rule of Civil Procedure 15 because it is untimely and unanticipated.  Specifically, Plaintiffs waited until the day before the close of fact discovery to inform Defendant of their intent to bring this motion despite knowing since December 2013 of Resnansky's second wrist surgery, and since June 2014 of the MRI that led to Resnansky's ankle surgery in September 2014.  Defendant also argues that Plaintiffs brought the motion despite stating numerous times to the court and to Defendant that they did not intend to bring any pretrial motions.  *See* Opp. at 3, 8; Tseng Decl. [Docket No. 34] at Ex. N; Case Management Conference Statement [Docket No. 11] at 4.  Defendant argues that Plaintiffs' motion was unduly delayed and will cause prejudice to Defendant.

Federal Rule of Civil Procedure 15 governs amendments to the pleadings, and states that the court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).   "This policy is 'to be applied with extreme liberality.'"  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted).  In the absence of an "apparent reason," such as undue delay, bad faith, dilatory motive, prejudice to defendants, futility of the amendments, or repeated failure to cure deficiencies in the Complaint by prior amendment, it is an abuse of discretion for a district court to refuse to grant leave to amend a complaint.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Rule 15 also governs amendments to the pleadings made *during* or *after* trial.  *See, e.g.* Fed. R. Civ. P. 15(b)(1) ("If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.").

At the outset, it is not entirely clear that Plaintiffs must make a Rule 15 motion in order to

15

seek an increase in damages above the amounts stated in their FTCA claims. Courts have

permitted plaintiffs to recover in excess of the amounts stated in their administrative claims at

various stages of lawsuits, including *after* trial, without requiring those plaintiffs to move

separately under Rule 15 to amend their pleadings. *See, e.g.*, *Michels*, 31 F.3d at 687 (where

plaintiff filed FTCA claim for $450,000 in damages resulting from motorcycle collision with

government vehicle, district court properly awarded plaintiff $710,000 *after* bench trial based on

conclusion that 28 U.S.C. § 2675(b) permitted plaintiff to recover damages in excess of

administrative claim); *Von Bargen*, 2009 WL 1765767 at *8 (denying plaintiff's motion for

permission to seek damages exceeding amount alleged in FTCA claim, without considering

whether plaintiff was required to amend his pleadings under Rule 15 or 16). *See also Richardson*,

841 F. 3d at 999 (plaintiff unsuccessfully moved to amend complaint at trial to recover increased

amount; Ninth Circuit remanded for consideration of the foreseeability of the plaintiff's injuries,

and also ordered district court to "determine whether the government would be prejudiced by

allowing the amendment" under Rule 15); *Salcedo-Albanez*, 149 F.Supp.2d at 1240 (denying

plaintiff's motion for leave to amend pursuant to Rule 15 to increase her damages claim above

FTCA claim amount).

  Indeed, there is no need for Plaintiffs to amend their Complaint in order to state a higher

damages amount, since the prayer for damages in a contested case (as opposed to a case in which

the defendant defaults) does not limit the relief that the trial court may grant. Fed. R. Civ. P. 54(c)

("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the

pleadings. Every other final judgment should grant the relief to which each party is entitled, even

if the party has not demanded that relief in its pleadings."). In any event, Plaintiffs' Complaint

notes that its damages prayer is an "an estimate" and a "presently unascertained sum."

  Even so, it is appropriate to consider what prejudice might result from a late request to

augment damages beyond the administrative claim. *See Salcedo-Albanez*, 149 F.Supp.2d at 1245

("Plaintiff's proposal to increase her claim to $500,000 would increase the government's potential

for liability six times over. For purposes of settlement, such an increase may have affected the

government's prior analysis and handling of Plaintiff's claim, notwithstanding Defendant's present

16

1   denials of legal liability.  To permit Plaintiff to now claim $500,000 in damages would seriously

2   undermine the primary goal of the FTCA—to facilitate administrative settlement prior to the

3   commencement of a civil action.").  The court is concerned that Plaintiffs waited until the day

4   before the close of fact discovery to inform Defendant of their intent to bring this motion, and

5   brought the motion despite informing the court and Defendant that it did not intend to bring any

6   pretrial motions.  However, because it appears that courts routinely consider whether a plaintiff

7   may recover in excess of his or her administrative claim at or after trial, the court cannot say that

8   Defendant was not on notice that this issue might arise in this case.  Defendant had the opportunity

9   to take full discovery regarding both subsequent surgeries and the additional claimed injuries.

10  Accordingly, the court declines to find that the late date of Plaintiffs' motion justifies its denial.

11       **C.     Requested Amount**

12       Finally, the court turns to the amount that Plaintiffs' request to recover in excess of the

13  amounts stated in their administrative claim.  Plaintiffs' administrative claims demanded $1.1

14  million; their present motion states their intention to seek $4.5 million in damages.  The court

15  notes that if "recovery in excess of the amount originally sought in an administrative claim is

16  justified, the plaintiff may only recover to the extent that the increased amount is attributable to

17  the newly discovered evidence or intervening facts."  *Craig v. United States*, No. 00 C 958, 2002

18  WL 31115604, at *5 (N.D. Ill. Sept. 23, 2002) (citations omitted).  *See also Michels*, 31 F.3d at

19  687 (permitting damages award in excess of claim amount only to the extent that the excess

20  amount was "directly attributable to damages arising from newly discovered evidence or

21  intervening facts").

22       Here, Plaintiffs have provided no evidence to support their request for a very substantial

23  increase in recovery.  Plaintiffs document no additional expenses, lost wages, emotional distress or

24  loss of consortium.  Ultimately, "the burden is squarely on the plaintiff to present evidence

25  demonstrating why and how the requested increase is connected to the newly discovered evidence

26  or intervening facts."  *Craig*, 2002 WL 31115604 at *6.  Although Plaintiffs have met their burden

27  of establishing that they can seek damages beyond the amounts of their administrative claims for

28  specific injuries that were not reasonably foreseeable, Plaintiffs will have to establish at trial that

United States District Court
Northern District of California

those injuries actually support an award in excess of the values stated in their FTCA claims.

**III.     CONCLUSION**

For the foregoing reasons, Plaintiffs' motion is **granted** insofar as the "newly discovered evidence" or "intervening facts" for seeking a claim amount above what is stated in their FTCA claims is the osteochondral lesion in Resnansky's ankle, her ankle surgery or the scapholunate damage in her wrist.  Plaintiffs' motion is denied as to Resnansky's second wrist surgery.

**IT IS SO ORDERED.**

Dated: May 1, 2015

_____

DONNA M. RYU
UNITED STATES MAGISTRATE JUDGE